| | |
|---|---|
| ALI AL-JAHMI, etc. | Case No. 2017-00986JD |
| Plaintiff/Counter Defendant | Judge Patrick M. McGrath |
| v. | <u>DECISION</u> |
| OHIO ATHLETIC COMMISSION | |
| Defendant/Counter Plaintiff | |

{¶1} Before the court are plaintiff Ali Al-Jahmi's (plaintiff) motion for summary judgment and motion for reconsideration as well as defendant Ohio Athletic Commission's (defendant) motion for summary judgment. Plaintiff's claims stem from the death of Hamzah Al-Jahmi (Hamzah), who collapsed during a December 19, 2015 boxing match sanctioned by defendant, and died three days thereafter from his injuries. In his complaint, plaintiff alleges defendant acted negligently and/or recklessly in numerous ways including through the conduct of the referee and ringside physician appointed by defendant. For the following reasons, the court denies plaintiff's motion for reconsideration and motion for summary judgment and grants defendant's motion for summary judgment.

**Motion for Reconsideration**

{¶2} On September 4, 2018, the court granted defendant partial summary judgment and dismissed plaintiff's negligence claim based on both primary and express assumption of risk. As to the former, the court found boxing to be an inherently dangerous sport from which the risk of head injury cannot be eliminated and, as to the latter, the court found Hamzah executed a release and waiver which barred any negligence claim. Plaintiff's motion for reconsideration seeks reversal of the court's previous summary judgment decision.

{¶3} As the court discussed in its previous decision, primary assumption of risk does not depend on the injured person's subjective consent or appreciation. Rather,

the activity at issue is examined to determine if it is inherently dangerous such that risks cannot be eliminated.  Primary assumption of risks bars recovery absent recklessness and participants in activities to which it applies are owed no duty to eliminate risks inherent to the activity.  The court again finds that boxing is an inherently dangerous sport to which primary assumption of the risk applies.

{¶4} Likewise, the court finds no reason to reverse its ruling that express assumption of risk also applies.  Hamzah executed a clear and unequivocal release of "any and all actions, causes of action, suits * * * claims and demands whatsoever known or unknown * * * against any and all of the persons or entities named in this paragraph."  The release clearly applies to any negligence claim, whatever the basis, that Hamzah may have had based on his participation in the December 19, 2015 fight.

{¶5} The court DENIES plaintiff's motion for reconsideration.  Plaintiff must establish recklessness.  The court now turns to the motions for summary judgment.

**Facts**

{¶6} On December 19, 2015, Hamzah was 19 years old and fighting in his first professional fight, an event titled "Seasons Beatings" held at the Ukrainian Hall in Youngstown, Ohio.  Defendant approved the fight and appointed the ringside physician, fight inspector, and referee for the event.  In the fourth round, Hamzah collapsed; he died three days later from his injuries.  Specifically, Hamzah suffered a concussion during the first round and, after additional blows to the head, suffered from brain swelling associated with second impact syndrome, a condition which plaintiff's expert analogizes to shaken baby syndrome.  Had the fight been stopped in the first round, Hamzah likely would have survived.  Exhibits 4 and 5 to Plaintiff's Motion for Summary Judgment, Affidavits of James P. Kelley and Mayumi Prins.

{¶7} Hamzah had been training as a boxer since he was 12 and had fought in several amateur fights.  Deposition of Ali Al-Jahmi p. 20; 22-23; 26; Deposition of

Mohamed Hamood p. 33; 78; 83.   Hamzah's coach and trainer, Mohamed Hamood (Coach Hamood), was in Hamzah's corner on the night of the fight.   Al-Jahmi depo. p. 49; Hamood depo. p. 41.   For four years, he had worked with Hamzah Monday through Friday about two hours a day and had also acted as Hamzah's trainer for about seven or eight of Hamzah's amateur fights.   Hamood depo. p. 21; 23; 26.   Plaintiff, Hamzah's father, observed his son's fight that night, standing about fifteen feet away. Al-Jahmi depo. p. 38.

{¶8} Rounds were three minutes with a one-minute rest period between rounds. Deposition of Wilfredo Osorio p. 57.   During the first round, Hamzah's opponent knocked him down three times.   Osorio depo. p. 96.   Hamzah initially took a left hook to the chin which knocked him down.   Hamood depo. p. 96.   As to this first knock down, Coach Hamood testified Hamzah "got caught with a * * * left hook.  Went down.  Got right back up."   Hamood depo. p. 42.   As to the second knockdown, Coach Hamood testified Hamzah "got back up and he was fixing his shorts * * * while the referee was counting and that's about it."   Hamood depo. p. 42.   As to the third knockdown, Coach Hamood testified it was not a true knockdown because Hamzah was pushed or shoved. Hamood depo. p. 43-44.

{¶9} Though plaintiff observed Hamzah's "legs * * * wiggling" after the first knockdown, he testified that Hamzah landed punches and defended himself throughout the first round.   Al-Jahmi depo. p. 40-42.   Likewise, Coach Hamood also observed Hamzah landing punches and defending himself during the first round.   Hamood depo. p. 42.   Any concerns he had regarding Hamzah being knocked down were alleviated when Hamzah got up, came to the corner and then responded to coaching.   Hamood depo. p. 74.   Regarding Hamzah's appearance during the first round, Coach Hamood testified, "I think when he stood up once, he stepped to the side once, but that's like normal when you get knocked down."   He further testified nothing appeared abnormal during the first round.   Hamood depo. p. 43.   In fact, Coach Hamood testified he would

have protested if the referee ended the fight during the first round "[b]ecause he wasn't really hurt in that way" and because Hamzah could land punches, defend himself and had a chance to win the fight. Coach Hamood was not concerned for Hamzah's safety during the first round. Hamood depo. p. 68.

{¶10} Coach Hamood described his interaction with Hamzah between the first and second round:

> Yeah. He came back to the corner and I – I put the seat in. I jumped in the ropes. He said: What I do wrong, Coach? And he sat down. He was upset. I said: Okay. You got caught. Your right hand wasn't up. You got to keep your right hand up and you got to move your feet laterally, side to side, don't just back straight up. He said: Okay, Coach. And I was talking to him just like I'm talking to you now and he was talking right back to me. He said: Okay, Coach.   And he went back through and won the second, third, and fourth round.
>
> * * *
>
> He did really well.
>
> * * *
>
> As I was talking to him, he was understanding.  He said, yeah, okay Coach, you know, okay, Coach. Hamood depo. p. 44-45.

Hamzah maintained eye contact with Coach Hamood and made no complaints. Hamood depo. p. 45.   Coach Hamood testified that Hamzah was talking and acting as he typically had between rounds during other fights. Hamood depo. p. 46. Based on his interaction with Hamzah, Coach Hamood felt Hamzah could continue fighting. Hamood depo. p. 100.

{¶11} As he did during the first round, plaintiff continued to observe Hamzah fight hard, land punches, and defend himself during the second and third round. Though plaintiff testified that Hamzah's legs were shaky, he indicated he believed it resulted

from Hamzah being "a little shy or intimidated because of so many fans, embarrassed." Al-Jahmi depo. p. 46. Plaintiff also believed that Hamzah won both the second and third rounds. *Id.* at 44-48.

{¶12} Likewise, Coach Hamood testified that Hamzah "came back and * * * won the [second] round and was moving well and * * * was punching well." He defended himself and incorporated Coach Hamood's coaching instructions during the second round. Hamood depo. p. 46. As in the first round, Coach Hamood did not believe the fight should be stopped or have any other concern for Hamzah's safety or well-being. *Id.* at 48.

{¶13} Between the second and third round, Coach Hamood again spoke to Hamzah regarding Hamzah's performance. He testified:

Q. And how did you know he understood what you were saying?

A. He would look me right in the eye. Okay, Coach. Okay, Coach. I got you. That's his word, I got you.

*Id.*

{¶14} Coach Hamood observed nothing unusual in the third round and continued to believe that there was no reason to stop the fight. *Id.* at 49. In fact, though Hamzah lost rounds one and four and the overall fight, he did win rounds two and three. *Id.* at 100; Deposition of Bernie Profato p. 106-108.

{¶15} Coach Hamood testified that, between the third and fourth round

[i]t was the same. [Hamzah] was doing a great job at that point. You did a great job, Hamzah. In fact * * * he got up early * * * I said, Hamzah, sit down, you got- you got time. He said, no, I'm ready, Coach, I'm ready, Coach. And he looked over at his father, which was standing maybe 20 feet away, 30 feet away. And he raised his hand to him, and he says, I'm ready, Coach, I'm ready to go. This is between the third and fourth round.

Hamood depo. p. 50.

Even into the fourth round, Coach Hamood thought Hamzah was doing a good job, both landing punches and defending himself, and observed nothing unusual. *Id.* at 51-52. However, Hamzah went down without being hit near the end of the fourth round, indicating that his knee was hurt before losing consciousness. *Id.* at 51-53.

{¶16} Hamzah's friend, Mohammed Yacoubi, also attended the fight. He testified that Hamzah had "spaghetti legs for a second * * * he was kind of wobbling" after the first two knockdowns in the first round. Deposition of Mohammed Yacoubi p. 18-19. However, he also testified that during the second round Hamzah looked 'okay. Like he kind of * * * came back." He also explained several times that Hamzah looked like he tired himself out. *Id.* at 22-23; 26; 28; 29-30.

{¶17} Emergency Medical Technicians sat ringside during the fight. One of them, Danielle Horton, thought Hamzah looked "uneasy on his feet" and informed her partner that Hamzah might need emergency services. Deposition of Danielle Horton p. 18-20. However, she observed Hamzah continue to defend himself and land punches. *Id.* at 21-23. The other EMT, Stephanie Schiavone, contacted the pair's dispatcher to request an ambulance during the first round because Hamzah was losing the round badly. Deposition of Stephanie Schiavone p.40; 43. After one of the knockdowns, she also heard the referee ask Hamzah if he was okay, to which he replied yes. *Id.* at 47-48. She also testified that she recommended to the ringside physician that Hamzah be assessed at the end of the first round. *Id.* at 133.

{¶18} Dr. James Armille (Dr. Armille), who is a dermatologist and a member of the Ohio Athletic Commission, acted as the ringside physician. Deposition of James Armille p. 7; 13. To become a ringside physician, Dr. Armille filled out an application and provided proof that he was a physician. *Id.* at p. 18. He undertook self-study regarding concussions. *Id.* at 37. He testified that his duty as a ringside physician is to monitor the fighters. He does so, in part, through observing the fighters during the fight to look for signs of injury. He testified that he is mindful of both brain injuries and

concussive impacts and is aware that signs of subdural hematoma may not manifest until after a fight. *Id.* at p. 28-29; 59-60. In assessing whether a boxer has sustained a concussion and/or brain injury, he looks at the boxer's actions and movement including whether the boxer is unsteady on his feet and/or could walk at an angle. He also notes whether the boxer is aware of his surroundings. *Id.* at 57. He testified that, though Hamzah was knocked down three times in the first round, he did not think Hamzah appeared wobbly or unsteady on his feet and that he observed Hamzah look at the referee after being knocked down. *Id.* at p. 25; 65-66. After Hamzah went down in the fourth round, he entered the ring to provide medical attention. *Id.* at p. 28, 68.

{¶19} Wilfredo Osorio (Mr. Osorio), the referee for the fight, had been refereeing amateur contests since 2009. He had also acted as a professional referee before the December 19, 2015 fight. Osorio deposition p. 15-16. However, Mr. Osorio could not recall when he obtained his referee's license. *Id.* at 16-17. He testified his job, as a referee, was to implement the rules and to make sure the boxers were safe. *Id.* at p. 35. As part of his amateur referee training, Mr. Osorio acted as a boxing judge for six months, during which he learned the rules of boxing. *Id.* at p. 20. In training to act as a professional referee, he worked with a veteran referee "one on one" learning how to move around the ring. *Id.* at p. 21. Mr. Osorio had previously stopped fights due to injury concerns. *Id.* at p. 32. However, he has never undergone training relative to brain injuries in boxing. *Id.* at p. 32; 66-67.

{¶20} He testified that, during the first round, Hamzah did not appear wobbly or unsteady on his feet and the boxers exchanged blows. *Id.* at 95-97. During breaks between rounds, Mr. Osorio indicated he would "look at the boxer, see if they're hurt. When their coach is talking, making sure that, you know, that they respond to their coach." He indicated he did so during the December 19, 2015 fight. *Id.* at p. 57. When Hamzah was knocked down, Mr. Osorio undertook the required standing eight-count before allowing the bout to continue. *Id.* at p. 63. Mr. Osorio has boxers walk toward

him after the standing eight-count to make sure the boxers are stable on their feet and can continue fighting. *Id.* at p. 99. During the fight and after boxers take blows, he checks to make sure "that the fighter's able to fight," looking at "body language, eyesight, [if] he's walking wobbly." *Id.* at p. 59.

{¶21} Bernie Profato has been the executive director of the OAC since 2004, before which he acted as a professional referee for approximately 200 fights. Deposition of Bernie Profato p. 11; 13-14. He attended the December 19, 2015 fight and acted as the fight inspector. *Id.* at p. 15. He testified that Hamzah defended himself throughout the first round and that he did not look wobbly. *Id.* at p. 91-92.

{¶22} Mr. Profato testified regarding the licensing process. Prospective referees complete license applications before shadowing licensed referees during actual fights at least three times. The veteran referee, if and when appropriate, then recommends the prospective referee for licensure. After observing two to three events, prospective referees work an event, during which they are evaluated. Mr. Profato testified "[t]hat's their final test. And they're evaluated on that. And if they pass that, because they've got that far, then they're issued a license" after obtaining the OAC's approval at a commission meeting. *Id.* at pp. 17-20; 22; 24-25; 27-29. Defendant does not verify that prospective referees possess knowledge of brain injuries when licensing them. *Id.* at p. 41. He testified prospective ringside physicians must be licensed physicians and normally must attend one event to observe how a ringside physician operates. *Id.* at p. 31.

{¶23} The court reviewed the available video, which depicts all four rounds. Both boxers are easily discernible as are the three knockdowns in the first round and numerous exchanges of blows between the boxers, both before and after these knockdowns. After each knockdown, Hamzah rises unassisted. Mr. Osorio separates Hamzah from his opponent and conducts the standing eight-count. Shortly after the second knockdown, Hamzah causes his opponent to stumble. The video depicts

Hamzah move around the ring, dodge punches, block punches and land numerous punches throughout the first, second, third and fourth round.  He also responds to Mr. Osorio's directions.  As the fight stretches into the fourth round, both boxers appear tired but Hamzah continues to attack and defend and to move around the ring before falling into the ropes while dodging punches being thrown by his opponent.

**Law and Analysis**

{¶24} Plaintiff's amended complaint delineates 38 specific actions and/or omissions of defendant that plaintiff asserts constitute negligence and/or recklessness. On summary judgment, plaintiff narrows the basis of his claims.  Plaintiff asserts that Mr. Osorio and Dr. Armille were unqualified and that defendant acted recklessly in appointing them for the Seasons Beatings event and in failing to disclose they were unqualified.  Plaintiff also asserts that defendant, through the inactions of Mr. Osorio and/or Dr. Armille, acted recklessly in failing to stop the fight in the first round. Defendant asserts two bases for summary judgment.  Defendant asserts it is entitled to discretionary immunity and that plaintiff cannot prove that it acted recklessly.

{¶25} Civ.R. 56(C) states, in part, as follows:

Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  No evidence or stipulation may be considered except as stated in this rule.  A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is

made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor.

See also Dresher v. Burt, 1996-Ohio-107, 75 Ohio St.3d 280 (1996). In Dresher, the Ohio Supreme Court held, "the moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record before the trial court which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." A "movant must be able to point to evidentiary materials of the type listed in 56(C)." Id. at 292.

{¶26} When the moving party has satisfied its initial burden, Civ.R. 56(E) imposes a reciprocal burden on the nonmoving party. It states:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated in the affidavit. Sworn or certified copies of all papers or parts of papers referred to in an affidavit shall be attached to or served with the affidavit. The court may permit affidavits to be supplemented or opposed by depositions or by further affidavits. *When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon mere allegations or denials of his pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the party does not so respond, summary judgment, if appropriate, shall be entered against the party.* (Emphasis added).

In seeking and opposing summary judgment, parties must rely on admissible evidence. *Keaton v. Gordon Biersch Brewery Rest. Group*, 10th Dist. No. 05AP-110, 2006-Ohio-2438, 2006 Ohio App. Lexis 2287, ¶18. The court addresses the parties' positions

collectively and relative to the bases upon which it finds summary judgment is appropriate.

**-Discretionary immunity applies to defendant's licensing, training and appointment of Mr. Osorio and Dr. Armille.**

{¶27} Defendant asserts discretionary immunity is a complete bar to plaintiff's claims. In *Reynolds v. State*, 14 Ohio St.3d 68, ¶ 1 of syllabus (1984), the Ohio Supreme Court held, "the state cannot be sued for its legislative or judicial functions or the exercise of an executive or planning function involving the making of a basic policy decision, which is characterized by the exercise of a high degree of official judgment or discretion" but that "once the decision has been made to engage in a certain activity or function, the state may be held liable, in the same manner as private parties, for the negligence of the actions of its employees and agents in the performance of such activities." Stated another way, discretionary immunity applies when "the [state makes] a decision but does not protect the state from culpable conduct in performing the activities necessary to implement that decision." *Risner v. ODOT*, 145 Ohio St.3d 55, 2015-Ohio-4443, ¶ 12-13.

{¶28} Thus, in *Reynolds,* the Court held that, while the Adult Parole Authority's decision to furlough a prisoner was entitled to immunity, a claim against the state could still be maintained based on the state's failure to confine the prisoner during non-working hours. *Reynolds,* 14 Ohio St.3d at p. 71. Likewise, in *Risner,* the Court held the Ohio Department of Transportation is immune when making decisions "regarding which portions of a highway it will improve and what type of improvement it will make." *Id.* at ¶ 1 of syllabus. The Court reasoned that, in its previous decisions, it had established that discretionary immunity applies to the decision "whether" to improve a highway as well as the decision as to "what type of improvement to make." *Id.* at ¶ 16. In finding that ODOT's decisions were entitled to immunity, the Court noted that ODOT, acted with both expertise and statutory authorization, and that the judicial branch is

prevented "from second-guessing ODOT's decisions in this regard."   However, the *Risner* Court refused to extend immunity to "ODOT's determination of *how* an improvement is implemented" and stated that "the actions of the agents or employees * * * are distinguishable from the original decision to take action and thus could be actionable. *Id.* at p. 61-62*.*

{¶29} Significantly, the 10th District has found discretionary immunity applies to state activities analogous to those at issue here.   In *Lewis v. Ohio Dep't of Health*, 66 Ohio App.3d 761, 765 (10th Dist.1990), the 10th District affirmed this court's decision granting a 12(B)(6) motion to dismiss where the plaintiff sought recovery based on the state's alleged failure to comply with state and federal statutes governing nursing home inspections.   Under the "any set of facts" standard and without discussing specific statutory requirements or any compliance or lack of compliance therewith, the 10th District found discretionary immunity applied to the "activity complained of" in *Lewis,* i.e. the state's inspection and/or licensing of nursing homes per state and/or federal statutory requirements.

{¶30} Discretionary immunity also applies to Disciplinary Counsel's decision to dismiss an attorney disciplinary complaint and to the Medical Board's decisions regarding the investigation and prosecution of doctor disciplinary complaints.   *See Robinson v. Office of Disciplinary Counsel*, 10th Dist. Franklin No. 98AP-1431, 1999 Ohio App. LEXIS 3928 (Aug. 26, 1999); *Schweisberger v. Med. Bd. of State of Ohio*, 10th Dist. Franklin No. 92AP-1766, 1993 Ohio App. LEXIS 2024 (Apr. 8, 1993).   It also applies to the decision to grant or deny parole and to various decisions of the Ohio Department of Rehabilitation and Correction including its decisions regarding inmate placement, transfer and security classification as well as its decision to remove seatbelts from transport vans.   *See Deavors v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 98AP-1105, 1999 Ohio App. LEXIS 2338 (May 20, 1999); *Allen v. ODRC*, 10th Dist No. 19AP-729, 2020 Ohio App. Lexis 1054.

{¶31} Portions of the statutory framework governing defendant and its regulation of boxing are also relevant.  R.C. 3773.34 and R.C. 119.01, *et seq.* empower defendant to enact rules under which boxing matches are conducted, which are contained in Ohio Administrative Code Chapter 3773.  As to referees, R.C. 3773.42 provides that, upon the filing of an application and the payment of the applicable fee, defendant "shall issue the license to the applicant if it determines that the applicant is of good moral character, is not likely to engage in acts detrimental to the fair and honest conduct of public boxing matches or exhibitions, and is qualified to hold such a license by reason of the applicant's knowledge and experience."  The knowledge and experience component requires that the applicant complete "such referee training requirements as the commission prescribes by rule" and must possess "such experience requirements as the commission prescribes by rule."  R.C. 3773.42(A-B).  Until the legislature amended it on September 29, 2015, the statute provided an additional condition in subsection (C).  Specifically, an applicant had to obtain:

> a passing grade on an examination administered by the commission and designed to test the examinee's knowledge of the rules of the particular sport that the person seeks to referee, the commission's rules applicable to the conduct of the matches and exhibitions in the particular sport that the person seeks to referee, and such other aspects of officiating as the commission determines appropriate to its determination as to whether the applicant possesses the qualifications and capabilities to act as a referee.

Ohio Adm. Code 3773-5-03 also addresses referee licensing and provides:

> (A)    A person shall not be determined to possess the knowledge and experience necessary to qualify them to hold a referee's license unless all of the following conditions are met:
>
> > (1) They are at least twenty-one years of age;

(2) They have experience as an amateur or professional referee; or have been evaluated by the executive director, inspector or person delegated by the commission;

(3) They have a current Ohio license to referee.

Only the administrative code addresses ringside physicians. O.A.C. 3773-2-04 requires that a ringside physician must be present "at all times" and "must be a licensed medical doctor or a doctor of osteopathic medicine * * * legally authorized to practice medicine" in Ohio.

{¶32} The court finds that defendant's decisions regarding the qualifications and appointment of ringside physicians and referees are clearly legislative acts and/or the kind of basic policy decisions that discretionary immunity protects. Regarding the appointment of Dr. Armille, Ohio Adm. Code 3773-2-04 requires only that ringside physicians "be a licensed medical doctor or a doctor of osteopathic medicine * * * legally authorized to practice medicine" in Ohio. It is undisputed that Dr. Armille met these requirements. Plaintiff's claims based on Dr. Armille's appointment and his criticisms of Dr. Armille, in effect, attack this regulation's lack of additional requirements for qualification as a ringside physician. Thus, Dr. Armille's field of practice and his level of individual study or training regarding boxing head injuries are immaterial. In the court's view, defendant's decision whether to include additional qualification requirements in its regulations and/or whether to appoint Dr. Armille as the ringside physician pursuant to those regulations is just as much a policy decision as the decision whether to improve one portion of highway over another or whether to initiate disciplinary proceedings against an attorney. The court will not second-guess these requirements, which resulted from defendant's basic policy decision regarding the regulations applicable to boxing matches in Ohio, and finds that immunity bars any claim based on defendant's appointment of Dr. Armille.

{¶33} Turning to defendant's appointment of Mr. Osorio, both the Revised Code and the Administrative Code set forth qualifications for referees, none of which require specific knowledge and/or training regarding head injuries.[1]  As for the contents of Ohio Adm. Code 3773-5-03, the court finds defendant's basic policy decision regarding the qualifications for referees, which is set forth in this regulation, is entitled to immunity. Thus, plaintiff's suggestion that defendant is reckless because it did not follow the Association of Boxing Commission standards for certifying referees and/or does not use the ABC's training program lacks merit.

{¶34} Plaintiff also asserts that his claims are based on defendant's implementation of R.C. 3773.42 and/or Ohio Adm. Code 3773-05-03 because it failed to assure Mr. Osorio had the "knowledge and experience" necessary to be a referee. However, the court finds that defendant's decisions, which the Revised Code empowers it to make, as to "the training requirements" a prospective referee must complete and the "experience requirements" a referee must possess are also policy decisions protected by discretionary immunity as is the determination, pursuant to these standards, whether an applicant possesses the knowledge and experience necessary to obtain licensure.  Thus, defendant cannot be liable for its decision to include or not include head injury training as part of its "training requirements" or its decision as to whether knowledge of head or brain injuries are necessary "experience requirements" an applicant must possess to qualify as a referee.  The same is true for defendant's decisions as to what type of evaluation process to utilize and/or whether to require or ensure knowledge of head injuries as part of any evaluation or examination before licensure.  All are policy decisions.  Thus, the court finds defendant's decision that Mr. Osorio was "qualified to hold a license by reason of [his] knowledge and experience" is entitled to immunity.

---

[1]Of course, the Ohio legislature enacts the Ohio Revised Code and there is no greater legislative function than the legislature's enactment of statutes.  In addition to being entitled to immunity, the decision embodied in R.C. 3773.42 is not one made by defendant who is the only party to this case.

{¶35} Further, despite plaintiff's assertion otherwise, Mr. Osorio's recollection of his evaluation and licensing process does not create an issue of material fact, one that would prevent the application of immunity.   In *Lewis,* the 10th District held, based partly on immunity, that similar activity, licensing and inspecting of nursing homes, failed to state a claim without examining the requirements of the inspection statutes at issue or the defendant's conduct thereunder.  The court cannot discern and finds no difference between licensing and inspecting nursing homes and evaluating and licensing referees. *Schweisberger* and *Robinson* are also instructive.   Like defendant's regulation of boxing, there is a statutory and regulatory framework that applies to disciplinary counsel and/or the medical board's investigation and prosecution of disciplinary complaints. Discretionary decisions made by these administrative bodies whether to initiate investigations or prosecutions, like decisions regarding the content of training or qualifications or whether a prospective referee is qualified, are entitled to immunity.

{¶36} Moreover, plaintiff's expert's opinions do not change the court's conclusion. Mr. Steele, is critical of defendant's training of Mr. Osorio and specifically its failure to assure Mr. Osorio possessed knowledge regarding head injuries and/or concussions. Plaintiff's assertion that defendant failed to assure knowledge of head injuries or that any specific failing of knowledge is actionable is no different than attacking defendant on the contents of the regulation itself.  *See Risner* 145 Ohio St.3d at 62-63 (Argument that ODOT's implementation of policies did nothing to improve intersection sight distance actually attacked the decision entitled to immunity itself).

{¶37} There is no genuine issue of material fact that defendant is empowered by and acts pursuant to both the Ohio Revised Code and the Ohio Administrative Code and that its decisions relative to its basic function of licensing and appointing ringside physicians and referees are basic policy decisions characterized by the exercise of a high degree of official judgment or discretion.   Based on immunity, the court finds

defendant is entitled to judgment as a matter of law as to any claims based on its licensing and appointment of Dr. Armille and Mr. Osorio.

### -Defendant did not act recklessly in failing to stop the fight

{¶38} In addition to asserting plaintiff acted recklessly in its appointment of Mr. Osorio and Dr. Armille, plaintiff asserts that defendant acted recklessly through the actions or omissions of both in failing to stop the fight in the first round. As noted above, "actions of the agents or employees * * * are distinguishable from the original decision to take action and thus [can] be actionable." *Risner* at p. 61-62. Thus, the court finds discretionary immunity does not apply to plaintiff's claims regarding the failure to stop the fight.

{¶39} Demonstrating recklessness is an onerous burden. One acts recklessly when "he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that the conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent." *Thompson v. McNeill*, 53 Ohio St. 3d 102, 104-105 (1990), *abrogated on other grounds. Accord Anderson v. City of Massillon*, 134 Ohio St. 3d 380, 2012 Ohio 5711, ¶ 4 of syllabus ("Reckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct"). Further, "[w]hile an act to be reckless must be intended by the actor, the actor does not intend to cause the harm which results from it." *Thompson* at 104-105. In contrast, "the term "negligence" is synonymous with heedlessness, thoughtlessness, inattention, inadvertence, and oversight, and conveys the idea of inadvertence as distinguished from premeditated or formed intention, or a conscious purpose to do a wrong act or to omit the performance of a duty." *Wolfe v. AmeriCheer, Inc.*, 10th Dist. No. 11AP-550, 2012-Ohio-941, 2012 Ohio App. Lexis 827, ¶ 17.

{¶40} In holding that recovery, based on conduct in sports, requires intentional or reckless conduct the Ohio Supreme Court indicated "our conclusion * * * must be understood in the context of the rules of the sport" and that "[w]hat constitutes an unreasonable risk under the circumstances of a sporting event must be delineated with reference to the way the particular game is played, *i.e.*, the rules and customs that shape the participants' ideas of foreseeable conduct in the course of a game."  The Court recognized the "inverse relationship" between duty and dangerousness in sports which "should enter into a court's decision-making process on a motion for summary judgment when the plaintiff alleges reckless or intentional conduct."  *Id.* at 104-105.

{¶41} As the court found in its first summary judgment decision, boxing is a sport involving "the art of attack and defense with the fists."  It is not a contact sport; it is a combat sport.  Boxers attack their opponent through punches to the head and body.  It is customary for boxers to be knocked down and/or sustain injury and continue to fight.  Even after multiple knockdowns involving one or both boxers, fights often continue until all rounds are concluded.  When moving from the amateur to professional ranks, as Hamzah did on December 19, 2015, boxers use smaller gloves, fight without headgear, and fight for more rounds in addition to facing better competition.  When asked about the dangers to boxers when entering the ring, Coach Hamood testified, "I mean all fighters going into the ring know this.  It's just a given rule.  You're getting punched in the head.  It's not normal."  (Hamood depo. p. 71.)

{¶42} Consequently, rules applicable to boxing matches in Ohio reflect boxing's violent nature.  The rules state that a knockout means "to defeat an opponent by knocking them to the canvas for a count of ten."  One way to accomplish a knockout, of course, is to strike an opponent in such a way as to render them unconscious.  A technical knockout requires not just that a fighter appear injured but that they be "too badly injured to continue."  There is no three-knockdown rule in Ohio so boxers can continue fighting even if they are knocked to the canvas by their opponent three or more

times in one round.  After a knockdown, while the referee is counting to ten, a boxer can rise, fall again and still fight so long as he is able to continue by the count of ten.  The rules even contemplate a boxer getting knocked out of the ring, re-entering the ring and continuing to fight.   Judges score the fighters each round based on punches, aggressiveness and defense.  Admn. Code 3773-1-01(D; H-I; K-L; U).

{¶43} Considering the above and given the inherent dangerousness of boxing, the court finds that the duty owed to Hamzah was low.  *Accord Levine v. Gross*, 123 Ohio App. 3d 326, 330-31 (9th Dist.1997) (As "[k]arate is a high-contact, inherently dangerous sport where contact to the head, face, and other parts of the body is actually encouraged by the rules * * * duty is low.").  In addition, the court finds injuries of all sorts, including serious head injuries, are an intrinsic part of boxing.

{¶44} Based on its review of the evidence presented by the parties including the video evidence, the court finds that there is no genuine issue of material fact and that defendant did not act recklessly in failing to stop the fight.   While the court acknowledges that there is some variation in the testimony of the witnesses regarding Hamzah's condition during the fight, this testimony does not establish a genuine issue of material fact regarding recklessness.  The video, which represents objective evidence of the December 19, 2015 fight contains no evidence of recklessness on the part of Mr. Osorio, Dr. Armille or anyone else.

{¶45} Further, there is no evidence that Mr. Osorio, Dr. Armille or anyone else was aware that Hamzah suffered a brain injury or any other serious injury necessitating that the fight be stopped during the first round. Mr. Osorio and Dr. Armille, both experienced, testified that they are mindful of boxer safety and observe fighters for signs of injury.  Mr. Osorio testified that he would have stopped the fight if he had any concern for Hamzah's well-being and that he had stopped fights previously.  (Osorio depo. p. 56.)    Thus, plaintiff seeks recovery based on defendant's failure to notice or be aware of Hamzah's injury.   Rather than exhibiting a conscious disregard or

indifference to a known risk, the evidence establishes, at most, thoughtlessness, inadvertence, or oversight which speaks to negligence, not recklessness. *See Wolfe v. Americheer,* 10th Dist. No. 11AP-550, 2012-Ohio-941, ¶ 20; 26, (Despite evidence that spotters involved in a dangerous cheerleading maneuver were in incorrect positions, the 10th District found "[t]here is no evidence that the spotters themselves recognized any facts that would lead them to believe that their conduct could or did create an unreasonable risk of harm to another * * * At best, their actions could be considered negligent.")

{¶46} Moreover, other undisputed facts support the court's finding that recklessness is absent. It is undisputed that both Hamzah and Coach Hamood were experienced. They had trained together for years and had participated together in numerous amateur fights. It is undisputed that Hamzah fought and defended himself well enough that defendant's judges found he won rounds two and three. Even Coach Hamood, who interacted with Hamzah during the minute between each round, failed to notice his injury and did not believe, at the time, that the fight should have been stopped. In fact, he testified Hamzah seemed fine and responded well to his instructions.

{¶47} Further, the fact that repeated blows to the head and serious head injuries are intrinsic to boxing bolsters the court's conclusion that defendant did not act recklessly. In *Doody v. Evans*, 186 Ohio App. 3d 479, 2010-Ohio-3523, a softball player sued for injuries which resulted from a collision at home plate that violated league rules. In upholding summary judgment, the 10th District found that the player's injuries were the result of a "foreseeable hazard of the game of softball." While acknowledging that a "fine line" sometimes exist between "sporting injuries that can and cannot be legally remedied," the court ultimately held that "[a]bsent evidence that appellant's injury arose out of conduct that was not truly an intrinsic part of the sport of competitive softball,

appellant's cause of action cannot be sustained." *Id.* at ¶ 33. The same is true here; Hamzah's injuries arose from conduct that is an intrinsic part of boxing.

{¶48} As the court finds defendant did not act recklessly, defendant is entitled to judgment as a matter of law based on plaintiff's claims related to the failure to stop the fight.

**Conclusion**

{¶49} Based upon the foregoing, the court finds that there are no genuine issues of material fact and that defendant is entitled to judgment as a matter of law. The court denies plaintiff's motion for summary judgment and grants defendant's motion for summary judgment.

PATRICK M. MCGRATH
Judge

[Cite as *Al-Jahmi v. Ohio Athletic Comm.*, 2020-Ohio-3487.]

| | |
|---|---|
| ALI AL-JAHMI, etc. | Case No. 2017-00986JD |
| Plaintiff/Counter Defendant | Judge Patrick M. McGrath |
| v. | <u>JUDGMENT ENTRY</u> |
| OHIO ATHLETIC COMMISSION | |
| Defendant/Counter Plaintiff | |

{¶50} A non-oral hearing was conducted in this case upon the parties' motions for summary judgment. For the reasons set forth in the decision filed concurrently herewith, plaintiff's motion for summary judgment is DENIED and defendant's motion for summary judgment is GRANTED. Judgment is rendered in favor of defendant. Court costs are assessed against plaintiff. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

PATRICK M. MCGRATH
Judge

**Filed May 13, 2020**
**Sent to S.C. Reporter 6/26/20**